Craig A. Hansen (SBN 209622)
  Email: craig@hansenlawfirm.net
Stephen C. Holmes (SBN 200727)
  Email: steve@hansenlawfirm.net
Sarah Wager (SBN 209277)
  Email: sarah@hansenlawfirm.net
HANSEN LAW FIRM, P.C.
75 E. Santa Clara Street, Suite 1250
San Jose, CA 95113-1837
Telephone: (408) 715 7980
Facsimile: (408) 715 7001

Attorneys for Plaintiff
Yuting Chen

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| YUTING CHEN,<br><br>Plaintiff,<br><br>v.<br><br>ARIEL ABITTAN, ABRAHAM ABITTAN, RACHEL ABITTAN, BRIAN ABITTAN, JACOB ABITTAN,  ALYSSA ABITTAN, ELIANA ABITTAN, ROY GRABER, TOVA GRABER, REALTIME NY LLC, a New York Limited Liability Company, and DOES 1-20, inclusive.<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1.  **BREACH OF CONTRACT**<br>2.  **BREACH OF CONTRACT**<br>3.  **BREACH OF FIDUCIARY DUTY**<br>4.  **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**<br>5.  **FRAUD**<br>6.  **CONVERSION**<br>7.  **UNJUST ENRICHMENT**<br>8.  **IMPOSITION OF CONSTRUCTIVE TRUST**<br>9.  **DECLARATORY RELIEF**<br>10. **ACCOUNTING**<br>11. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>12. **CIVIL CONSPIRACY**<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiff Yuting Chen ("Chen" or "Plaintiff") hereby alleges for her Complaint against

2  defendants Ariel Abittan, Abraham Abittan, Rachel Abittan, Brian Abittan, Jacob Abittan,

3  Alyssa Abittan, Eliana Abittan, Roy Graber, Tova Graber, RealTime NY LLC, a New York

4  limited liability company, and Does 1 through 20, as follows, upon information and belief:

5                                    **NATURE OF THE CASE**

6    1.    Plaintiff Yuting Chen is a wealthy Chinese immigrant with a limited command of

7  the English language and of American culture.

8    2.    All named defendants, which include Ariel Abittan and his family, learned of

9  Chen's financial status and lack of business sophistication and dubbed her as a prime target for a

10  calculated scheme to defraud Chen, and later her friends, for millions of dollars.

11    3.    With defendant Ariel Abittan as the front man, the defendants concocted countless

12  fabricated stories in order to gain and maintain Chen's confidence in his family's wealth and their

13  exclusive connections in the form of celebrities, politicians and the business elite.  The sole

14  purpose of their web of lies was to entice Chen into conducting business with Ariel Abittan so

15  that defendants could infiltrate her life and rip her off. That's exactly what happened.

16    4.    Defendants lured Chen into business dealings with Ariel Abittan that were

17  financially disastrous for Chen and specifically designed to cheat her. When Chen figured out that

18  Ariel Abittan was a con artist she cut ties with him, so defendants tried to extort her.  The

19  defendants demanded that Chen immediately pay $4.5 million, threatening that failure to comply

20  would result in grave harm to Chen and her family, as well as a lawsuit against Chen personally.

21  Chen refused and Ariel Abittan sued her the next day, wrongfully and maliciously slinging her

22  name through the mud. Chen also has constant fear for the safety of her and her family given her

23  refusal to pay the extortion demand.

24    5.    Chen seeks recovery in this action for her tremendous financial losses resulting

25  from her business relationship with Ariel Abittan, induced and maintained with the assistance of

26  the remining co-conspirator defendants who are believed to have financially benefitted from the

27  business transactions, and mental/emotional anguish resulting from their deceitful and malicious

28  conduct.

**THE PARTIES**

6.    Plaintiff Yuting Chen is and all times herein was an individual residing in Atherton, California.

7.    Defendant Ariel Abittan is an individual residing in Lawrence, New York.

8.    Defendant Abraham Abittan is an individual residing in Lawrence, New York.

9.    Defendant Rachel Abittan is an individual residing in Lawrence, New York.

10.    Defendant Brian Abittan is an individual residing in Lawrence, New York.

11.    Defendant Jacob Abittan is an individual residing in Lawrence, New York.

12.    Defendant Alyssa Abittan is an individual residing in Lawrence, New York.

13.    Defendant Eliana Abittan is an individual residing in Lawrence, New York.

14.    Defendant Roy Graber is an individual residing in Memphis, Tennessee.

15.    Defendant Tova Graber is an individual residing in Memphis, Tennessee.

16.    Defendant RealTime NY LLC is a New York limited liability company with its principal place of business in Lawrence, New York. RealTime NY is owned by defendant Ariel Abittan.

17.    Chen presently does not know the true names and capacities of the Defendants sued herein as DOES 1-20, inclusive, and therefore sues those defendants by such fictitious names.  Chen will amend this complaint to allege such defendants' true names and capacities when they are ascertained.  Chen is informed and believes, and based thereon alleges, that each of the fictitiously designated defendants was acting as the agent, partner or joint venturer of all other defendants and is joint and severally responsible for the acts and omissions alleged herein.

18.    Chen is informed and believes, and thereon alleges, that the defendants, and each of them, were the agents, servants, employees, and co-conspirators of their co-defendants and each of them, and in doing the things alleged herein were acting within the course and scope of their authority as such agents, servants, employees, and co-conspirators and with the permission and consent of their co-defendants, and each of them (collectively referred to herein as "Defendants").

/ / /

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is compete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

20.     Personal jurisdiction is proper as to each Defendant because: (1) each Defendant purposefully availed themselves of the benefits of the State of California; (2) the controversy is related to and arises out of their contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

21.     A substantial part of the events giving rise to the claims alleged in this Complaint occurred in or were directed to the County of San Mateo. Venue therefore lies in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(2).

**DIVISIONAL ASSIGNMENT**

22.     A substantial part of the events giving rise to the claims alleged in this Complaint occurred in or were directed to the County of San Mateo. For the purposes of intra-district assignment under Civil Local Rules 3-2(c) and 3-5(b), this Action should be assigned to the San Francisco or Oakland Divisions.

**FACTUAL ALLEGATIONS**

23.     Chen is an immigrant. About a decade ago, she emigrated to the U.S. and settled in California. As a new immigrant, the cultural, language and other social barriers for Chen have remained challenging for years. Nevertheless, blessed with supportive family and friends, she has been thriving in the U.S.

24.     In or around 2015, Chen developed an interest in luxury watches and discovered that they had a good resale value in secondary markets. Initially as a hobby, Chen started trading extremely high-end, exclusive and highly sought-after luxury watches. Among the luxury brands that she had handled, Chen was mostly interested in Patek Phillippe watches. Chen was from a well-to-do family and has solid personal wealth to support her interest in those watches.

25.     Gradually, the casual trade became more frequent. As the volume increased, her hobby morphed into a side business. Chen used a simple business model - she would purchase the

luxury watches from retailers that she believed to be good investments, then resell them in the secondary market.  She found interested buyers through personal connections and online platforms.

26.     The purchase price for the watches Chen invested in typically ranged from thirty thousand dollars to one hundred thousand dollars. Sometimes the price was substantially higher. Despite the fact that she was not a trained businessperson and the high retail price tags, Chen's financial ability to accumulate and maintain a sizeable inventory of a few million dollars, combined with the very hot luxury watch resale market, made her business lucrative and successful.

27.     From time to time, Chen's family and friends who had similar interests helped her with various aspects of the watch business, such as recommending good investments, tracking inventories, sorting records, and the like.  Chen did not need and was not looking to build a consistent business relationship with someone outside of her circle of family and friends.

28.     However, through deception and lies, Ariel Abittan conned his way into forming and maintaining a regular business relationship with Chen in connection with her watch business. Through this business relationship, defendants perpetrated fraud to gain Chen's trust and infiltrated her life, taking advantage of her lifestyle, tricking her into bad business deals, and cheating her out of millions. Ariel Abittan also used Chen to get to her friends for the sole purpose of defrauding them too.

29.     In 2016, Ariel Abittan responded to one of Chen's online listings for a particular high-end watch. Ariel Abittan first conversed with Chen's friend about the listing and made an impression on her friend, who then involved Chen.  The conversation went well and the discussions went off-line.

30.     When Chen and Ariel Abittan first interacted, he was a financial advisor. He was trained and well-versed in financial issues and had held Series 7 and Series 66 licenses, which allow selling securities and acting as wealth managers for his clients.

31.     Around the time Ariel Abittan met Chen or soon after, Ariel Abittan had started to accumulate a substantial amount of credit card debt, both in his own name and in the name of

businesses he controls. In that regard, he did not have the financial resources requiring a substantial amount of liquid asset to follow Chen's business model for her watch business, which involved not only paying up front for inventory, but also uncertainty about when each particular watch would sell.

32.     During their initial discussions, Ariel Abittan quickly found out that Chen was wealthy.  Moreover, it was evident that Chen had limited command in English, was an immigrant and lacked social experiences and contacts outside of her circle of family and friends in California. Realizing that Chen was a vulnerable target, Ariel Abittan and his co-defendant family members formulated a detailed plan to defraud Chen in connection with her watch business and later in other areas.

33.     In connection with the initial watch business and their continuous fraud on Chen over several years, the defendants weaved extensive lies designed to lure her into a business relationship with Ariel Abittan and keep her there.

34.     During the initial discussions over the watch business and continuously thereafter, the individual defendants marketed Ariel Abittan to Chen as the scion of a wealthy family and well-connected to other families of similar socioeconomic status around the U.S. Ariel Abittan told Chen that he had access to exclusive clientele in the form of celebrities, politicians, and the business elite, and that because of his intimate connections with these individuals, Ariel Abittan would be an invaluable business partner.

35.     In one instance, Ariel Abittan told Chen that he could get Chen invited to the White House and other lavish political and celebrity events to gain access to the rich and famous. Ariel Abittan also told Chen that Ariel Abittan's father, Abraham Abittan, was a famous plastic surgeon in New York City with a barrage of celebrity clients and other powerful connections, perfect for purchasing luxury watches. To further lure her, Ariel Abittan stated that Chen and her friends could have free plastic surgeries, touting it as a huge favor since Dr. Abittan was so acclaimed.

36.     To support the Abittan family's story of running with the rich and famous and other lies, defendants are believed to have doctored photographs, forged records such as text

messages and financial documents, all to con Chen into forming and maintaining a business relationship with Ariel Abittan. The doctored photos include, but are not limited to former President Donald Trump, Trump's son-in-law Jared Kushner, and the leaders of multi-billion-dollar companies.  Ariel Abittan particularly told Chen that he personally knew Jared Kushner and he would recruit Kushner in the watch business.

37.     Ultimately, none of Ariel Abittan's representations regarding his lavish lifestyle and the luxuries Chen would experience if she had a business arrangement with him ever came to fruition. Chen was never invited to attend and did not attend a single event, exclusive or otherwise, at Abittan's behest.

38.     Chen never met or interacted with any of Ariel Abittan or his family's supposed affluent, powerful or famous friends even though Chen and Ariel Abittan did business together for years.  Chen also later came to learn that defendant Abraham Abittan is not a plastic surgeon, let alone a famous one with a New York City-based practice. He is a dermatologist.

39.     Later on, when Ariel Abittan traveled to California to visit Chen, he and the co-defendant family members would stage elaborate scenes designed to deceive and impress Chen and reenforce the fraudulent representations regarding Ariel Abittan and his family. For instance, during a "family" conversation with Ariel Abittan when Chen and her friends present in or around 2018, Rachel Abittan, mother of Ariel Abittan, would team up with Abraham Abittan stating that they were developing some miracle high-end cosmetics for skincare to be marketed at high-end department stores and that they planned to open spas in such department stores.

40.     Ariel Abittan's wife Elaina Abittan together with her parents, Roy and Tova Graber, represented to Chen and her friends that they owned big real-estate development businesses and had developed properties over billions of dollars. They represented to Chen and her friends that they owned numerous premier properties and the famed department store Saks Fifth Avenue was their tenant. Ariel Abittan's brothers, Brian and Jacob Abittan, also represented to Chen and her friends that they were famous and well-connected lawyers, whereas Ariel Abittan's sister, Alyssa Abittan, represented to Chen and her friends that her husband was a wealthy businessman.

41.     None of the representations were actually true and were, instead, part of the Abittan family's (including his in-laws, the Graber family's) broader scheme to convince Chen that doing business with Ariel Abittan would bring access to some of the most elite business people in the county in terms of his family members directly, and their personal multi-millionaire connections.

42.     In addition to the co-defendant family members helping Ariel Abittan defraud Chen, they also defrauded Chen's friends directly.  For instance, when Chen and her friends were visiting New York, Abraham Abittan lured Chen's friend into a supposedly "free" facial treatment, but actually charged Chen's friend over $10,000 for a facial that lasted for 2 hours.

43.     While Chen and her friends were visiting New York, the co-defendants family members also asked Chen and her friends to meet people within the defendants' Jewish community to make them believe that Chen and her friends were very wealthy foreign investors, willing to invest in the defendants' businesses. Chen and her friends declined their invitation.

44.     Back in 2016, after being bombarded by Ariel Abittan and other individual defendants' extensive and continuous lies, Chen was induced into believing Ariel Abittan would be valuable in her watch business and maintained business relationship with him. Chen welcomed Ariel Abittan into her inner circle with trust, confidence and generosity.

45.     Chen started Ariel Abittan with a 20% commission based on each watch he sold, the percentage of which increased over time.  Pursuant to their business relationship, Chen would procure the watches and Ariel Abittan was primarily responsible for locating buyers. Even though Chen had no difficulty selling the watches on her own given their exclusivity and highly-sought after nature, Ariel Abittan and his co-defendant family's representations about their elite societal connections made the most sense for their respective roles.

46.     Through their business relationship Chen and Ariel Abittan became what she thought were personal friends and a great deal of their business was conducted in person. Ariel Abittan would regularly fly to California and meet Chen in her residential city of Atherton. Believing that he was a trustworthy person at that point, Chen unsuspectingly introduced Ariel Abittan to her friends and they began to engage in business dealings unrelated to watches.

47.     Ariel Abittan convinced Chen that, in order for him to sell the watches, Chen needed to give the watches to him to show to potential buyers.  Throughout the relationship of the watch business, Ariel Abittan took a large collection of highly valuable and sought-after watches from Chen, many of them are Patek Phillipe rare watches. The watches were either mailed to Ariel Abittan or picked up by him in person without complete payment or sometimes without any payment.

48.     The watches taken by Ariel Abittan include the coveted Patek 5711/1A, Patek 5712/1A, Patek 5711/1R, Patek 5726/1A, Patek 5980/1R, Patek 5230G New Yor Skyline Special Edition, Patek 5131/1P World time Enamel Dial (Application Piece), just to name a few. Especially, Ariel Abittan managed to take from Chen the extremely rare Patek Tiffany Stamped 5712/1A and 5980R, which are near impossible to get anywhere now.  Ariel Abittan also lied to Chen that he had to sell the watches at under the MSRP because the market was not good at that time, which was far from true.

49.     In connection with the watch business and subsequent business events, Ariel Abittan had used Realtime NY LLC, believed to be an entity he created and controls, in transactions, sending and receiving funds using via bank account in its name to defraud Chen.

50.     The watches bought and sold in connection with the business are worth millions of dollars and are highly sought after by investors and collectors. To hide his fraudulent acts while still keeping their business relations ongoing, Ariel Abittan did not steal Chen's watches or their sales proceeds outright. Instead, taking advantage of her trust, he made serial and gradual lies to her.

51.     Initially, to substantiate the lies on having an elite clientele base, Ariel Abittan claimed that he had sold the watches with great margins. He would wire some portions of some sale proceeds back to her, but not in full. Many times he only paid two thirds of the acquisition cost by Chen.  When Chen demanded complete payment and an accurate accounting of the profits, he would come up with some excuses as to why he could not pay the total amount back to Chen. For example, Ariel Abittan told Chen that some customers required financing, hence he could only send her partial payments. But Ariel Abittan did not follow up with any arrears from

the people who supposedly financed or documentation on the investment he did for Chen.  At other times, Ariel Abittan told Chen that he had held onto and invested the money for her in other ventures based on his financial background and she would get it back plus additional investment income. Chen, however,  never received a dime from Ariel Abittan for any such purported investment.  Further, there are 12 watches Ariel Abittan took from Chen for which Chen has received zero payment and no confirmation as to the status of the watches – whether they remain in Ariel Abittan's possession or have been sold.

52.     In sum, through various lies, Ariel Abittan underpaid Chen not only for the profit that she deserved, but even the out-of-pocket acquisition costs she paid. Taking advantage of her inexperience in business finance, he steadily bled her business and embezzled the proceeds.

53.     In or around 2018, seeing a very hot luxury watch resale market Ariel Abittan was no longer satisfied with being essentially a sales agent for Chen's watch business. He proposed to revamp their business relationship that would give him more financial interest in Chen's watch business. To convince Chen to accept the proposed business structure, he stated he would pay some of the acquisition costs. Ariel Abittan's proposal regarding the proposed partnership changed from conversation to conversation. At one time he proposed he would pay 50% of the acquisition cost, at other times 90%.  He repeatedly changed his words, walking back and forth on what he offered and what he could contribute. Nevertheless, none of the terms materialized or were put into writing although the basic structure of their agreement remained unchanged – Ariel Abittan was to sell the watches, accurately account to Chen for the sales proceeds, and pay Chen her share of the proceeds.

54.     At times, when Chen followed up on the proposals, asking if Arial Abittan would pay some of the acquisition costs he promised, he would use the funds that he had acquired from a prior watch sale that he had underreported to Chen and misrepresent the source of the funds in order to deceive her. Later on, he would use delay tactics, stating he had no money at the particular time.

55.     The defendants' fraud on Chen did not stop at the watch business. Prior to the fallout of their business relationship and friendship, Ariel Abittan became accustomed to the

1  lavish Atherton lifestyle where Chen resides and conned Chen into purchasing luxury items that

2  Abittan would not otherwise be able to pay for himself.

3      56.    For example, in 2018 while visiting California, Ariel Abittan told Chen that he

4  wanted a Ferrari for use while he was in town but he had no cash. Ariel Abittan presented Chen

5  with what is now believed to be a forged document showing that Abittan had over $10 million

6  tied up in a business investment, for which he soon expected some return.  Abittan told Chen that,

7  because he did not have enough credit and his money was tied up in investments, he needed a

8  signatory for the car.  He asked Chen the tremendous favor of being that person and swore that he

9  would pay her back. Believing him to be a good friend and trusted business associate at that point,

10  Chen entered into a loan agreement for a Ferrari 488, which was approximately $400,000.

11      57.    Ariel Abittan took possession of the car while in California but never paid Chen

12  back for the down payment or for the remainder of the loan. Using what Chen later determined to

13  be Ariel Abittan's typical delay tactics he made the excuse that his money did not come through

14  so he could not pay for the car after all.  Chen therefore got stuck with a loan for a car she did not

15  need or want and had to pay it off.

16      58.    Defendants also defrauded Chen in relation to the payment of credit card debt. In

17  or around 2018 Ariel Abittan told Chen that he had a credit card with around $50,000 credit line.

18  He stated that he wanted to have a higher credit line on the credit cards and asked Chen and her

19  friends to use those cards on his behalf. He stated that those cards came with premium points and

20  he could give some of the points to Chen and her friends to use.

21      59.    Believing his words, Chen and her friends started using and repaying his credit

22  card. As expected, the credit line for the cards quickly increased to $300,000. However, after a

23  few billing cycles, Chen and her friends started to find that they might not be the only persons

24  using the card. From month to month, they would be paying more to the credit cards than they

25  would be able to use. For over a year, Chen paid back on Ariel Abittan's credit cards for over a

26  million dollars. However, she was not able to use all the credit that she paid off. Essentially, Chen

27  unwittingly paid off Ariel Abittan's credit card debt. The overall discrepancy between the amount

28  Chen used on the card and the amount she paid out was over $400,000.

60.    In or around late 2019, defendant Abraham and Rachel Abittan flew to California in an attempt to further their fraudulent scheme on Chen and her friends. They asked Chen and her friends to continue to pay for Ariel Abittan's credit card debt and said that they would repay her.  They did not.

61.    After her financial losses accumulated to a greater degree, in and around late 2019 and early 2020, Chen started to suspect that Ariel Abittan was actually a fraud and been defrauding her and her friends all along. When she asked Ariel Abittan to pay her back the extra amount that she paid to the credit cards, Ariel Abittan threatened to report her to authorities for unauthorized use of the credit cards. Similarly, when Chen asked Ariel Abittan to account for the sales proceeds for the watches and return the watches that he hadn't sold, he threatened to report Chen's resale watch business to Patek Phillipe, which although was legal, would cause Patek Phillipe to no longer sell their rare watches to her as a VIP.

62.    No longer being able to justify Ariel Abittan's dubious behavior in her mind, Chen cut business and personal ties with him in early 2020.

63.    Realizing that Chen could no longer be a victim to defendants' fraudulent scheme in the form of a direct relationship, defendants went to even greater lengths to target Chen by attempting to extort her, threatening the safety and well-being of Chen and her family.

64.    Specifically, on December 23, 2020 Chen received a threatening phone call from an anonymous number. The unidentified caller made it abundantly clear that he was associated with the Abittan family.  The caller instructed Chen to pay $4.5 million within a few hours or suffer grave consequences. The caller told Chen that failure to pay would result in her suffering great damages, including being personally named in a lawsuit, not being able to return to her home country, and the ruining of her and her family's reputation.  The most horrific of the caller's threats involved the security of her children's futures.

65.    Chen did not pay the ransom and immediately called the Atherton police.

66.    Not coincidentally, Chen was personally named and misidentified in a lawsuit filed by Ariel Abittan the next day.  In the lawsuit Abittan fraudulently identifies Chen as Lily Chao, knowing that in fact, they are not the same person since they have done in-person business

together for years and frequently met with Ariel Abittan together.

67.     Because of Defendants threats and unsuccessful extortion, Chen has suffered immense damages, including constant fear for the safety of her family and the tarnishing of her family's good name.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Breach of Contract- Watch Business

### (Against Ariel Abittan)

68.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

69.     In 2016 Plaintiff and Ariel Abittan entered into a business agreement in connection with Chen's luxury watch business. The details of the business agreement morphed between 2016 and 2019 but the basic terms were the same: Chen provided Ariel Abittan with luxury watches to sell, Ariel Abittan was required to account to Chen for the sales profits and Ariel Abittan was to receive and agreed-upon percentage of the sales proceeds. All unsold watches were exclusively owned by Chen regardless of whether they were in Chen's or Ariel Abittan's possession.

70.     Ariel Abittan breached the business agreement with Chen by failing and refusing to pay Chen her fair share of the sales proceeds, claiming instead that Abittan invested it on her behalf even though he did not have permission to do so; lying to Chen about the sales margins in order to take a greater percentage of the profit for himself; paying acquisitions costs with money that was unaccounted for to Chen and belonged to her; and taking personal possession of watches without accounting for their sales and/or misappropriating and converting them to his personal property without Chen's permission and without compensating her.

71.     Plaintiff performed or substantially performed all of her obligations under the agreement except those which were excused by Ariel Abittan's breaches.

72.     As a direct and proximate result of Ariel Abittan's breaches of the agreement Plaintiff has suffered damages in an amount to be proven at trial.

/ / /

1

**SECOND CAUSE OF ACTION**

2

**Breach of Contract – Payment of Credit Card Debt**

3

**(Against Ariel Abittan)**

4      73.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

5   this Complaint as if fully set forth herein.

6      74.    Beginning in 2018 Plaintiff and Ariel Abittan entered into a business arrangement

7   wherein Chen agreed to pay off Abittan's credit card debt, in exchange for Ariel Abittan's

8   promise that Chen could recoup her entire loan amount by making purchases on the card after the

9   balance had been paid off and that she could personally use the credit card points earned through

10   the transactions.

11      75.    Pursuant to the terms of their agreement Chen continually paid down the entire

12   credit card debt on full.

13      76.    Ariel Abittan breached the parties' agreement by giving multiple people use of the

14   same card such that Chen was unable to use it when she tried and therefore unable to recoup her

15   costs or receive the bargained for benefit of the credit card points.

16      77.    Plaintiff performed or substantially performed all of her obligations under the

17   agreement except those which were excused by Ariel Abittan's breaches.

18      78.    As a direct and proximate result of Ariel Abittan's breaches of the parties'

19   agreement in relation to the payment of credit card debt Plaintiff has suffered damages in an

20   amount to be proven at trial.

21

**THIRD CAUSE OF ACTION**

22

**Breach of Fiduciary Duty**

23

**(Against Ariel Abittan)**

24      79.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

25   this Complaint as if fully set forth herein.

26      80.    Based on their business arrangement Ariel Abittan owed Chen a fiduciary duty to

27   act with the utmost good faith, loyalty and in the best interests of Chen.

28      81.    Abittan breached his fiduciary duties to Chen by failing and refusing to pay Chen

her fair share of the sales proceeds, claiming instead that Abittan invested it on her behalf even though he did not have permission to do so; lying to Chen about the sales margins in order to take a greater percentage of the profit for himself; paying acquisitions costs with money that was unaccounted for to Chen and belonged to her; and taking personal possession of watches without accounting for their sales and/or misappropriating and converting them to his personal property without Chen's permission and without compensating her.

82.     Ariel Abittan's breaches of his fiduciary duties caused Chen to suffer tremendous financial losses in an amount to be proven at trial.

83.     Because Ariel Abittan's breaches of his fiduciary duties to Chen were committed through fraud and with oppression and malice, Chen is entitled to punitive damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against the Co-Defendant Family Members)

84.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

85.     As set forth above Ariel Abittan owed Chen fiduciary duties stemming from their business relationship.  As also set forth above Ariel Abittan breached those duties.

86.     The co-defendant family members knew that Ariel Abittan owed Chen fiduciary duties. As Ariel Abittan's family members, they were aware of Ariel Abittan and Chen's arrangements relating to the watch business, and took affirmative steps to help secure and maintain that business relationship.

87.     The co-defendant family members aided and abetted Ariel Abittan's breaches of his fiduciary duties by concocting and participating in lies designed to defraud Chen in her watch business, stemming from Ariel Abittan's breaches.

88.     The co-defendant family members' conduct in connection with aiding and abetting Ariel Abittan's breaches of fiduciary duties was a substantial factor in causing Chen's harm. Chen relied on the defendants' representations in deciding to do and continuing to do business with

1    Ariel Abittan.

2         89.    Because the co-defendant family members' aiding and abetting Ariel Abittan's

3    breaches of his fiduciary duties to Chen were committed through fraud and with oppression and

4    malice, Chen is entitled to punitive damages in an amount to be proven at trial.

5                                **FIFTH CAUSE OF ACTION**

6                                        **Fraud**

7                                **(Against All Defendants)**

8         90.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

9    this Complaint as if fully set forth herein.

10        91.    As detailed herein Ariel Abittan has made repeated false and fraudulent

11   misrepresentations and omissions to Plaintiff regarding his financial status and abilities, personal

12   connections, family connections, his family's businesses, the amount of money he sold each

13   watch for, the source of his funds for his watch contributions, what he did with the watch sales

14   proceeds, the location of the watches and his need to take personal possession of them in order to

15   sell them, his credit card debt and Chen's ability to recoup her payments of his credit card debt

16   and the incentives she would receive for doing so.

17        92.    As detailed herein, the co-defendant family members made representations to

18   Chen in order to induce and maintain Chen's business relationship with Ariel Abittan. These

19   representations concerned Ariel Abittan's socio-economic status and personal connections as well

20   as their own wealth, businesses and personal connections.

21        93.    These representations were false when made.

22        94.    When defendants made these representations and omissions, they knew that they

23   were false.

24        95.    These representations and omissions were made with the intent to defraud and

25   deceive Chen into initially doing and continuing to do business with Ariel Abittan and bailing

26   him out of his purported credit card debt.

27        96.    Plaintiff relied on defendants' misrepresentations to her detriment by entering into

28   and maintaining a business relationship with Ariel Abittan, entrusting him with her property and

1   helping him financially.

2         97.    Plaintiff's reliance on defendants' misrepresentations and omissions was

3   reasonable given the great lengths that the defendants collectively went through to defraud her

4   though various in person and telephonic/video "family" meetings. The family collectively was so

5   nice, welcoming and convincing, Chen believed their stories, which turned out to be flat out lies.

6         98.    As a result of the defendants' fraudulent misrepresentations and omissions,

7   Plaintiff has been damaged in an amount to be proven at trial.

8         99.    In doing the acts alleged herein, defendants acted with oppression, fraud, and

9   malice, and Plaintiff is entitled to punitive damages.

10   **SIXTH CAUSE OF ACTION**

11   **Conversion**

12   **(Against Ariel Abittan)**

13         100.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

14   this Complaint as if fully set forth herein.

15         101.    Chen had a right to possess the luxury watches belonging to her and her share of

16   income generated from the watches that have been sold, plus the amount paid to acquire each

17   watch. She also has a right to possess the money she used to pay off Ariel Abittan's credit card

18   debt that was supposed to be able to recoup and did not.

19         102.    Ariel Abittan intentionally and substantially interfered with Chen's property

20   interest by refusing their return.

21         103.    As a direct and proximate result of Ariel Abittan's conversion of Chen's assets and

22   interests, Chen has incurred damages in an amount to be proven at trial.

23         104.    Ariel Abittan's actions as alleged herein were oppressive, fraudulent, and

24   malicious.  As a result, Plaintiff is entitled to an award of punitive damages in an amount to be

25   proven at trial.

26   / / /

27   / / /

28   / / /

COMPLAINT AND DEMAND FOR JURY TRIAL        16        CASE NO.

**SEVENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(Against All Defendants)**

105.   Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

106.   Defendant Ariel Abittan received a benefit from his business dealings with Chen in the form of luxury watches, sales income from the luxury watches and money in the form of paid down credit card debt.

107.   Despite Chen's demands that Ariel Abittan return the unsold watches, pay her share of income from the sales of the watches that have been sold and reimburse her for paying off Abittan's credit card debt, Abittan has refused, causing him to become unjustly enriched.

108.   The remaining defendants received a benefit from Ariel Abittan's unjust enrichment by receiving funds and/or property from Ariel Abittan, resulting in the remaining defendants also becoming unjustly enriched.

109.   As a result of the defendants' conduct, Chen is entitled to receive an award in the amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**

**Imposition of Constructive Trust**

**(Against All Defendants)**

110.   Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

111.   Ariel Abittan, his business and his co-defendant family members are in in possession of watches and money that belong to Chen.

112.   As the owner of the property, Chen has a right to possess it.

113.   Chen has asked Ariel Abittan to return her property that is in his or his family members possession and he has refused.

114.   As a result, Chen's property should be placed in constructive trust until such a time that it can be safely returned to her.

COMPLAINT AND DEMAND FOR JURY TRIAL

17

CASE NO.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NINTH CAUSE OF ACTION**

**Declaratory Relief**

**(Against Ariel Abittan)**

115.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

116.    A real and existing controversy exists as to ownership of any remaining watches from Chen's luxury watch business and related sales proceeds, in that Ariel Abittan claims he owns them, even though they belong to Chen.

117.    As such, Chen requests a Court declaration that the watches and related sales income belongs exclusively to her.

**TENTH CAUSE OF ACTION**

**Accounting**

**(Against Ariel Abittan)**

118.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

119.    Chen and Ariel Abittan had a business arrangement in connection with Chen's luxury watch business wherein Ariel Abittan took physical possession of several luxury watches that he either sold or still has. Ariel Abittan has not reported or accurately accounted to Chen for these watches, whether in his custody or sold, and has not accurately accounted to Chen for other watch sales.

120.    Because the specific inventory and sales-related information is exclusively within Ariel Abittan's possession, Chen cannot determine the true amounts due and owing to her without an accounting.

**ELEVENTH  CAUSE OF ACTION**

**Intentional Infliction of Emotional Distress**

**(Against All Defendants)**

121.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

this Complaint as if fully set forth herein.

122.    On December 23, 2020 defendants brazenly attempted to extort $4.5 million from Chen through a terrifying phone call. The phone call itself and threats made during the call constituted extreme and outrageous conduct on the part of defendants.

123.    Because the caller threatened Chen and her family's safety, security and reputation, defendants intended to cause, or had reckless disregard of the possibility of causing emotional distress.

124.    As an actual and proximate cause of the horrifying phone call and attempted extortion Chen has suffered extreme and severe emotional distress, constantly fearing for her and her family's safety and security, and worrying about the of tarnishing her family's good name. She has also suffered monetary damages in the form of purchasing security equipment and paying for security guards, which continue to this day.

125.    As an actual and proximate cause of her not complying with defendants' heinous and criminal extortion demand Chen has also suffered extreme and severe emotional distress by her name being smeared in Ariel Abittan's lawsuit misidentifying her as Lily Chao, when Ariel Abittan knows for a fact that Plaintiff is not Lily Chao.

126.    Based on defendants' outrageous extortionist conduct Chen is entitled to compensatory damages in amount to be proven at trial.

127.    Because defendants' conduct was oppressive and malicious Chen is also entitled to punitive damages in an amount to be proven at trial.

## TWELVTH  CAUSE OF ACTION

### Civil Conspiracy

### (Against All Defendants)

128.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

129.    Through the above-described actions, defendants, acting in concert through knowing and mutual agreement, formed a conspiracy and conspired.

130.    The purpose of the conspiracy was, in sum, to defraud Chen financially.

131.    Defendants' operation of the conspiracy, through acts such as: the making of repeated false and fraudulent misrepresentations and omissions to Plaintiff regarding their financial status and abilities, personal connections, family connections and businesses, have damaged and continue to damage Chen.

132.    As such, each defendant is liable to Chen on the basis of civil conspiracy, as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not they were a direct actor and regardless of the degree of their activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests entry of judgment in her favor against Defendants as follows:

1.    For declaratory relief, stating and confirming that all unsold luxury watches and income from watch sales belong exclusively to Chen.

2.    For preliminary and permanent injunctive relief, restraining Ariel Abittan from selling, gifting or otherwise disposing of the luxury watches that came to him through his business dealings with Chen.

3.    For an accounting.

4.    For imposition of a constructive trust over all Chen's watches and money currently in the possession of any defendant.

5.    For compensatory, special, incidental and consequential damages according to proof.

6.    For exemplary and punitive damages to the extent permitted by law.

7.    For recovery of the unjust enrichment obtained by Defendants as a result of their wrongful conduct.

8.    For an award of prejudgment interest, cost of suit, and reasonable attorneys' fees to the extent permitted by contract or by operation of law.

9.    For such other and further relief as the Court may deem just and proper.

1   DATED:  December 3, 2021                    HANSEN LAW FIRM, P.C.

2

3

4                                              By: _____/s/ Craig A. Hansen_____
                                                        Craig A. Hansen
5
                                               Attorneys for Plaintiff
6                                              Yuting Chen

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury on all jury triable claims and issues in this action.

3

4

5     DATED:  December 3, 2021                    HANSEN LAW FIRM, P.C.

6

7

8                                                By: _____/s/ Craig A. Hansen_____
                                                      Craig A. Hansen
9
                                                 Attorneys for Plaintiff
10                                                Yuting Chen

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28